UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERAWN FARMING, INC.,

                Plaintiff,

     v.

REHRIG PACIFIC COMPANY,

                Defendant.

_____/

Case No. 1:11-cv-01273 LJO BAM

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

(Doc. 69)

        Pending before the Court is Defendant Rehrig Pacific Company's ("Defendant's" or "Rerig's") motion for summary judgment.  Plaintiff Gerawan Farming, Inc., ("Plaintiff" or "Gerawan") has filed an opposition to the motion, and Defendant has filed a reply.  Having carefully considered the parties' submissions and the entire record in this case, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment.

## I.     BACKGROUND

###      A.    Factual Background

        Plaintiff is the nation's largest grower of peaches, plums, and nectarines and is also one of the nation's largest growers of table grapes.  Defendant is a manufacturer of plastic-molded containers for industrial use.  This case concerns a dispute between the two over the patent and ownership interests in three containers used for harvesting fruit: (1) the Grape Lug; (2) the Harvest Tote; and (3) the Second Generation Harvest Tote.

1

### 1.    The Grape Lug

In March 1992, Cory Phillips ("Mr. Phillips"), a Marketing Representative for Rehrig, began researching and marketing a durable container for storing and transporting grapes.  Mr. Phillips spoke with industry experts, researched then-existing agricultural containers, and called potential users of the product.  In the subsequent months, Jeff Ackerman ("Mr. Ackerman"), a Design Engineer for Rehrig, and William Apps ("Mr. Apps"), Head of New Product Development for Rehrig, joined Mr. Phillips in the project.  The three worked to market and design a mold for a grape container, which would later become known as the "Grape Lug."

The project progressed from 1992 through 1993, and included the following notable events. In December 1992, Rehrig drafted a preliminary memorandum regarding the Grape Lug that contained general dimensions and price proposals for the product.  In February and May 1993, Rehrig drafted production studies for the Grape Lug.  By June 14, 1993, Rehrig had fully engineered drawings of the Grape Lug depicting the design and specific dimensions of the container.  Also, on or around that date Rehrig ordered the mold for the Grape Lug.  On July 1, 1993, Rehrig sent a proposal of the Grape Lug to Sun World, a potential customer.

In addition to its efforts to sell the Grape Lug, Rehrig sought to patent the product.  On July 8, 1993, Rehrig authorized its patent counsel to initiate a patentability search on the Grape Lug.  Rehrig ultimately filed a patent application in August 1993, identifying Mr. Ackerman as the sole inventor of the Grape Lug.  However, a few months later Mr. Phillips and Mr. Apps were added to the application as inventors.  On May 16, 1995, the U.S. Patent Office issued a patent for the Grape Lug.  The patent, U.S. Patent No. 5415293 ("the '293 Patent"), identified three individuals as co-inventors of the Grape Lug: Mr. Ackerman, Mr. Apps, and Mr. Phillips.

At some point in 1993, Mr. Phillips contacted Gerawan and arranged a meeting to gauge the company's interest in the Grape Lug.  The parties dispute when the meeting actually occurred; Rehrig asserts that the meeting occurred in late July 1993, while Gerawan asserts that the meeting occurred in June or early July 1993.  In any event, at the meeting Mr. Phillips discussed the Grape Lug with Dave Dever ("Mr. Dever") and Ray Gerawan ("Mr. Gerawan") from Gerawan.  Mr. Gerawan and Mr. Dever reviewed preliminary design drawings of the Grape Lug, but ultimately concluded that their company

was not interested in the grape container.  Mr. Gerawan and Mr. Dever did, however, express interest in developing a picking bin for harvesting stone fruit for which Mr. Gerawan had a prior conception. The picking bin would later become known as the "Harvest Tote."

### 2.      The Harvest Tote

On September 15, 1993, Gerawan and Rehrig signed a confidential disclosure agreement ("the 1993 Confidentiality Agreement") to facilitate the two companies' efforts in developing the Harvest Tote.  Under the 1993 Confidentiality Agreement, Gerawan agreed to disclose what it considered to be trade secrets, patentable information, and other proprietary materials relating to the Harvest Tote.  In exchange, Rehrig agreed not to disclose the information to others and to use the information only to develop the Harvest Tote for Gerawan.  Moreover, Rehrig agreed that the rights to any improvements or modifications to the Harvest Tote and any inventions conceived as a result of reviewing Gerawan's materials would be assigned to Gerawan.

In the ensuing months, from October 1993 to July 1994, Gerawan and Rehrig sought to reach an agreement over the sales and marketing of the Harvest Tote.  The companies exchanged numerous drafts of an Agreement in Principle, which included various terms such as: (1) Gerawan agreed to pay for the mold of the Harvest Tote; (2) Rehrig agreed to engineer and manufacture the Harvest Tote to Gerawan's specifications; (3) Gerawan agreed to provide Rehrig an exclusive license to manufacture the Harvest Tote; (4) Rehrig agreed to pay Gerawan royalties from the sales of the Harvest Tote; and (5) Rehrig agreed to refrain from improving the Harvest Tote for anyone besides Gerawan.  However, it is unclear whether a final and firm agreement was ever reached.  Gerawan maintains that one was, while Rehrig asserts that one was not.  There is no signed copy of any final "Agreement in Principle" between the two companies.

Whatever the status of an agreement was, Gerawan did agree to buy the mold and Rehrig did agree to pay royalties to Gerawan from sales of the Harvest Tote.  Sales of the Harvest Tote began in the middle of 1994, but no patent was ever filed for the Harvest Tote.

### 3.      The Second Generation Harvest Tote

In or around 2000, Rehrig began to discuss with Gerawan the possibility of producing a next generation Harvest Tote ("the Second Generation Harvest Tote"), and by 2002, Gerawan understood

that Rehrig was actually preparing to begin design work on the Second Generation Harvest Tote.  To express its interest in participating in the designing of the Second Generation Harvest Tote, Gerawan sent an email to Rehrig on January 14, 2002.  However, for reasons that are still unknown, the parties never met to discuss the Second Generation Harvest Tote and Rehrig proceeded to design the Second Generation Harvest Tote on its own.  Meanwhile, sales of the original Harvest Tote came to an end in or around September 2002.

Rehrig began production of the Second Generation Harvest Tote in March 2003.  Though it is unclear which features, if any, of the Harvest Tote were carried over to the Second Generation Harvest Tote, the Second Generation Harvest Tote does differ from the Harvest Tote in many significant ways. In particular, the Second Generation Harvest Tote: (1) has an exterior rib structure; (2) does not have hollow corners; (3) has exterior sliders; (4) is not made with double thick material; (5) has a contoured bottom; (6) has a stacking ledge on all four sides; (7) has an open corner design; and (8) has an option for a plastic handle.

Although Rehrig openly advertised the Second Generation Harvest Tote, there is a dispute as to whether Gerawan was actually aware that Rehrig had begun selling the Second Generation Harvest Tote.  For example, on April 1, 2003, George Papangellin ("Mr. Papangellin") of Gerawan told Jon Kalin ("Mr. Kalin") at Rehrig via email that one of Gerawan's affiliates in Mexico, Grupo Alto, had expressed interest in the Second Generation Harvest Tote and might want to buy it the following year. Although the email makes clear that Mr. Papangellin was aware that Rehrig was designing the Second Generation Harvest Tote, there is no indication that Mr. Papangellin was aware of the fact that it was actually available for sale already.

Similarly, from 2004 to 2006, Mr. Gerawan observed harvesters using the Second Generation Harvest Tote at Reedley Farms and Wawona Packing.  However, Mr. Gerawan believed the containers were the products of another company that had simply beaten Gerawan and Rehrig to the market.  As such, Mr. Gerawan did not ask Reedley Farms, Wawona Packing, or Rehrig about the containers. According to Mr. Gerawan, it was not until August 2008 that he discovered the containers were made by Rehrig.  Mr. Gerawan maintains that a representative at a packing company told him "Rehrig" after he asked who the container's manufacturer was.

**B.     Procedural History**

Plaintiff initiated this action on July 29, 2011.  After the Court granted Defendant's motion to dismiss, Plaintiff filed an amended complaint on March 23, 2012.  The amended complaint, which is presently the operative complaint, asserts the following causes of action: (1) correction of inventorship pursuant to 35 U.S.C. § 256; (2) false promise under California tort law; and (3) unfair competition in violation of California's Unfair Competition Law ("the UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, and California common law.

Defendant filed the instant motion for summary judgment on February 14, 2013.  Plaintiff filed an opposition to the motion on February 28, 2013, and Defendant filed a reply on March 7, 2013.  The Court found Defendant's motion to be suitable for decision without oral argument and took the matter under submission pursuant to Local Rule 230(g).

**II.     LEGAL STANDARD**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party."  Id.

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  Id. (citing Celotex, 477 U.S. at 323).

If the movant has sustained its burden, the nonmoving party must "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original). The nonmoving party must go beyond the allegations set forth in its pleadings. See Fed. R. Civ. P. 56(c). "[B]ald assertions or a mere scintilla of evidence" will not suffice. Stefanchik, 559 F.3d at 929. Indeed, the mere presence of "some metaphysical doubt as to the material facts" is insufficient to withstand a motion for summary judgment. Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. at 587.

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. That remains the province of the jury. See Anderson, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably, and therefore justifiably, be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

## III.   DISCUSSION

### A.   Correction of Inventorship

Plaintiff seeks to correct the '293 Patent and have Mr. Gerawan named as a co-inventor of the Grape Lug. Defendant responds that it is entitled to summary judgment on Plaintiff's claim for three reasons. First, Defendant argues that Plaintiff lacks standing to bring this claim. Second, Defendant contends that even if Plaintiff has standing, Plaintiff's claim for correction of inventorship is untimely and barred by the doctrine of laches. Third, Defendant argues that Plaintiff's evidence is insufficient to support its claim.

#### 1.   Standing

A plaintiff asserting a claim for correction of inventorship pursuant to 35 U.S.C. § 256 must establish standing. See Larson v. Correct Craft, Inc., 569 F.3d 1319, 1326 (Fed. Cir. 2009). In other words, "[the plaintiff] must show that [he] has suffered an injury-in-fact, that the injury is traceable to

6

the conduct complained of, and that the injury is redressable by a favorable decision." Chou v. Univ. of Chicago & Arch Dev. Corp., 254 F.3d 1347, 1358 (Fed. Cir. 2001) (citations omitted).  A plaintiff typically establishes standing to pursue a § 256 claim by showing that he has an expected ownership interest in the patent at issue, or otherwise has a concrete financial interest in the patent.  See Larson, 569 F.3d at 1326-27; Chou, 254 F.3d at 1358-59.

Defendant maintains that Plaintiff does not have an expected ownership interest in the '293 Patent.  Defendant points to the general rule that absent any assignment, rights to an invention belong to the inventor.  Accord Bd. of Trustees. v. Roche Molecular Sys., 131 S. Ct. 2188, 2195, 180 L. Ed. 2d 1 (2011).  Defendant further asserts that there is no evidence that Mr. Gerawan assigned any of his rights to the '293 Patent to Plaintiff prior to filing this case.  Therefore, according to Defendant, even if Plaintiff is successful in proving that Mr. Gerawan is an inventor of the Grape Lug in this case, Mr. Gerawan, and not Plaintiff, will obtain an ownership interest in the '293 Patent.

Plaintiff counters that Mr. Gerawan's relationship with Plaintiff is so close and intertwined that Mr. Gerawan is essentially Plaintiff's alter ego.  Thus, according to Plaintiff, any patent rights that Mr. Gerawan obtains in this action will belong to Plaintiff as well, even absent any express assignment of rights from Mr. Gerawan to Plaintiff.  Plaintiff cites LeFiell v. United States, 162 Ct. Cl. 865 (1963)[1] as support for its argument.

In LeFiell, Cecil K. LeFiell ("Mr. LeFiell") obtained a patent for a tube tapering machine and subsequently filed suit in the name of himself and his company against the United States for allegedly manufacturing and using his invention without his prior authorization.  Id. at 866-67.  In response, the United States moved to dismiss the company from the case, arguing that the company did not have an ownership interest in the invention since its title belonged to Mr. LeFiell only.  Id. at 867.  Mr. LeFiell countered that he always considered the company as the true owner of the invention, and therefore the company was a proper party in the case.  See id. at 867-68.

The Court of Claims agreed with Mr. LeFiell.  The court reasoned that an inventor may have

---

[1] The holdings of the Court of Claims serve as precedential law in patent cases.  See S. Corp. v. United States, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc).  Defendant has not provided, nor has the Court independently found, any cases showing that LeFiell is no longer good law.

such a close and intertwined relationship with a company that the inventor is essentially the alter ego of the company.  Id. at 869.  In those circumstances, the patent rights of the inventor belong entirely to the company, even if there has been no express assignment of rights.  Id.  The court concluded that Mr. LeFiell had alleged facts sufficient to show that he was the company's alter ego.  According to Mr. LeFiell: (1) he was the president, general manager, and principal stockholder of the company; (2) he used the company's time and resources to develop the invention; (3) the company paid the expenses associated with securing the patent for the invention; and (4) the company received all the profits from the invention and patent.  Id. at 870.

In this case, a trier of fact could reasonably conclude that Mr. Gerawan was the alter ego of Gerawan from 1993 to 1994, the time frame when the Grape Lug was allegedly invented.  See Melin v. United States, 201 Ct. Cl. 748, 756 (1973) ("[I]n determining the question of ownership of a patent between a company and an employee under the 'alter ego' theory, . . . the relationship which existed between the employer and the employee at the time when the invention was made is determinative, and not the relationship at a subsequent time.").  Critically, during this time frame Mr. Gerawan was the most senior officer at Gerawan, a company owned by his family.  He was also one of its directors. There is some uncertainty as to how much actual managerial control Mr. Gerawan exercised, but there is evidence from which a trier of fact could conclude that Mr. Gerawan had primary responsibility for product development at the company, which included the designing of harvest containers.  Moreover, Mr. Gerawan believed that his work, and any inventions derived therefrom, belonged to the company. In fact, the company, not Mr. Gerawan, received all the royalty payments generated from his work on the Harvest Tote.

Because a trier of fact could reasonably conclude that Mr. Gerawan was the alter ego of the company, the Court cannot rule as a matter of law that Plaintiff does not have an expected ownership interest in the '293 Patent.  Accordingly, Defendant is not entitled to summary adjudication on the basis that Plaintiff lacks standing.

## 2.    Laches

"Laches is an equitable defense that may bar an inventorship claim."  Serdarevic v. Advanced Medical Optics, Inc., 532 F.3d 1352, 1358 (Fed. Cir. 2008).  To establish laches, the party raising the

defense carries the ultimate burden of proving that the plaintiff's delay in bringing the instant action is "unreasonable and inexcusable" and that the defending party has in fact suffered "material prejudice attributable to the [plaintiff's] delay." Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1297 (Fed. Cir. 2004) (citation omitted).

"[A] delay of more than six years after the omitted inventor knew or should have known of the issuance of the patent [produces] a rebuttable presumption of laches." Advanced Cardiovascular Sys. v. SciMed Life Sys., 988 F.2d 1157, 1163 (Fed. Cir. 1993). Thus, if the party asserting laches is able to establish that the plaintiff had actual knowledge of the disputed patent's issuance, or was aware of facts that would have led a man of ordinary intelligence to inquire into the matter, it is presumed that the plaintiff's delay in bringing suit was unreasonable and the defending party suffered prejudice. See id. at 1161-62. The burden then shifts to the plaintiff to rebut this presumption by offering evidence showing that the delay was reasonable or that the defending party has not suffered prejudice as a result of the delay. Serdarevic, 532 F.3d at 1359-60. If the plaintiff does not meet its burden of production, the defending party prevails. Id. at 1359.

Defendant attempts to establish a rebuttable presumption of laches by arguing that Plaintiff knew, or a reasonable person would have known, that a patent had been issued for the Grape Lug at least six years prior to initiating this action. First, Defendant notes that the '293 Patent is published by the U.S. Patent Office and can be viewed, as all U.S. patents can, by the public. Second, Defendant maintains that each of the nearly four million Grape Lugs purchased and used by Plaintiff from 1994 through 2001 was marked "patent pending" or stamped with the Grape Lug's actual patent number. Defendant contends that these markings, along with any information Plaintiff would have gathered had it investigated the patent status of the *Harvest Tote*, should have alerted Plaintiff more than a decade ago that the '293 Patent had been issued to Defendant without naming Mr. Gerawan as a co-inventor of the Grape Lug.

Defendant's argument falls short. As an initial matter, the public recordation of the '293 Patent in the U.S. Patent Office does not mean that, as a matter of law, Mr. Gerawan should have been aware of the patent's issuance for the purpose of laches. See Advanced Cardiovascular Sys., 988 F.2d at 1162-63 (explaining that any constructive notice provided by recording a patent in the Patent Office

does not impute the knowledge necessary to trigger laches).  As for the patent markings on the Grape Lug, Plaintiff insists that all the Grape Lugs it purchased were marked "Patent Pending" and not with the actual patent number.  In any event, even if Plaintiff knew that the Grape Lugs were marked with a patent number, the issue is not what *Plaintiff* knew, but what *Mr. Gerawan* knew.  Mr. Gerawan is the alleged co-inventor; therefore, it is the facts in *his* knowledge that matter.  See id. at 1163 ("[A] delay of more than six years after the *omitted inventor* knew or should have known of the issuance of the patent [produces] a rebuttable presumption of laches.") (emphasis added).  Defendant has not offered evidence to fill the gap between Plaintiff's knowledge and Mr. Gerawan's, and has not demonstrated that Mr. Gerawan was aware that the Grape Lug was patented or was being patented.[2]  Accordingly, Defendant falls shy of establishing a rebuttable presumption of laches and therefore is not entitled to summary adjudication on this basis.

### 3.    Sufficiency of Evidence

The issuance of a patent "creates a presumption that the named inventors are the true and only inventors." Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998) (citing Hess v. Advanced Cardiovascular Sys., 106 F.3d 976, 980 (Fed. Cir. 1997)).  However, if a person not named in an issued patent proves by "clear and convincing evidence" that he is a co-inventor, and that he was not identified in the patent through error and without any deception intent on his part, a district court may order the patent corrected.  See 35 U.S.C. § 256 (2011); Fina Oil & Chemical Co. v. Ewen, 123 F.3d 1466, 1472 (Fed. Cir. 1997).

Conception, which is the "formation in the mind of the inventor[] of a definite and permanent idea of the complete and operative invention," is the touchstone of inventorship.  Burroughs Wellcome Co. v. Barr Laboratories, Inc., 40 F.3d 1223, 1227-28 (Fed. Cir. 1994).  Therefore, to be a co-inventor, a person must "contribute in some significant manner to the conception of the invention." Fina Oil & Chem., 123 F.3d at 1473.  See Ethicon, 135 F.3d at 1460.  "[M]erely assisting the actual inventor after conception of the claimed invention;" providing the actual inventor well-known principles or state of

---

[2] The Court acknowledges the tension of viewing Mr. Gerawan as the alter ego of Plaintiff in the context of standing, but separate entities in the context of laches.  Nevertheless, the question of assignment and the question of actual knowledge are distinct.

the art without ever having a firm and definite idea of the claimed combination as a whole; or reducing the actual inventor's idea to practice through ordinary skill in the art does not make one a co-inventor. Ethicon, 135 F.3d at 1460.

A co-inventor need not contribute to the conception of every claim contained in a patent; nor must he make the same amount of contribution as another inventor. See 35 U.S.C. § 116. Rather, "[a] contribution to one claim is enough." Ethicon, 135 F.3d at 1460 (citation omitted). Thus, in the end, "the critical question is who conceived, as the term is used in the patent law, the subject matter of the claims at issue." Id.

In this case, the concepts that are at issue are the Grape Lug's (1) lid design; (2) use of holes for ventilation; (3) corner design and structure; and (4) placement of holes in the container's floor for cooling. Defendant maintains that it conceived these concepts, as well as every other concept tied to the Grape Lug in the '293 Patent, prior to any discussion or meeting it had with Plaintiff. According to Defendant, its first meeting with Plaintiff occurred in late July 1993. Defendant stresses that prior to that point it had already (1) engineered drawings of the Grape Lug's body and lid (June 14, 1993); (2) sent a proposal of the Grape Lug to Sun World (July 1, 1993); (3) authorized its patent counsel to initiate a patentability search on the Grape Lug (July 8, 1993); and (4) received three part sheets for the Grape Lug (July 22, 1993).

Defendant's engineered drawings of the Grape Lug, dated June 14, 1993, are critical pieces of evidence. According to Mr. Phillips, the engineered drawings of the Grape Lug depict the final form and dimensions of the Grape Lug as it is embodied in the '293 Patent. Notably, the drawings include (1) a lid; (2) structured corners; and (3) a configuration of holes in the container's sides and floor (i.e., the very same aspects that Plaintiff now claims that Mr. Gerawan contributed to the Grape Lug). Mr. Phillips asserts that Defendant generally creates such drawings so that its tool builder can fabricate a final mold for the product. Mr. Phillips thus opines that Defendant ordered a mold for the Grape Lug on or around June 14, 1993.

Defendant's proposal to Sun World, which is dated July 1, 1993, is also notable. The proposal touted the Grape Lug's ventilation and stacking ability. The proposal materials also included pictures of the Grape Lug that clearly depicted (1) a lid; (2) structured corners; and (3) a configuration of holes

11

in the container's sides and floor.  In fact, the pictures included in the proposal materials are virtually identical to the ones used in the '293 Patent.

Taken together, Defendant's evidence demonstrates that Defendant's conception of the Grape Lug was firm and definite by June 14, 1993.  Thus, it became Plaintiff's burden in opposing summary judgment to offer clear and convincing evidence showing one of two things: (1) the Grape Lug shown in Defendant's engineered drawings is different from the Grape Lug embodied in the '293 Patent; or (2) Mr. Gerawan made his alleged inventive contributions to the Grape Lug sometime *before* June 14, 1993.  Cf. Ethicon, 135 F.3d at 1460 (assisting an actual inventor after conception of the invention has already occurred does make one a co-inventor).  Plaintiff attempts to do the latter in its opposition and relies on Mr. Dever's notes and testimony as support for its argument.  However, as explained below, Plaintiff's reliance on this evidence is ultimately misplaced.

The first issue that Plaintiff must offer clear and convincing evidence on is the timing of the first meeting between Mr. Gerawan and Mr. Phillips.  This is the only meeting between Plaintiff and Defendant that could have occurred sometime before June 14, 1993.  Mr. Dever asserted that he and Mr. Gerawan first met with Mr. Phillips "in June or early July 1993."  (Doc. 77 ¶ 3; see also Doc. 81, Ex. C at 31:12-17.)  The next meeting between Mr. Gerawan and Defendant, according to Plaintiff's own evidence, did not take place until mid or late July 1993.

Mr. Dever's testimony that the first meeting took place "in June or early July 1993" does not, in of itself, show that Mr. Gerawan met with Defendant before June 14, 1993.  However, Mr. Dever also testified during his deposition that at the parties' first meeting, Mr. Phillips showed Mr. Gerawan design drawings of the Grape Lug in which the Grape Lug did *not* have a lid:

> Q:      The design that Mr. Phillips said he had been working on when you said he had been working on when you first met with him in June, July 1993, did he say it was one- or two-piece?
>
> A:      I don't recall if he specifically stated it was one-piece or two-piece.  I remember just a picture design, and I only remember it being a one-piece.  It didn't have a lid on it at that time.
>
> Q:      So, at the very first meeting you had with Mr. Phillips, you remember him showing you a design which did not have a lid?
>
> A:      Right.  Correct.

(Doc. 81, Ex C at 42:4-14.)  This testimony, along with Mr. Dever's assertion that the parties first met in June or early July 1993, could lead a trier of fact reasonably to conclude that Mr. Gerawan did in fact meet with Defendant sometime before June 14, 1993, and at a point when the Grape Lug had not yet been fully conceived.

It is, however, not enough to show that the parties met before June 14, 1993.  The second issue that Plaintiff must offer clear and convincing evidence on is the substance of the parties' discussions at the meeting.  Specifically, Plaintiff must show that at the meeting, Mr. Gerawan made some inventive contribution to the Grape Lug as embodied in the '293 Patent.  See Ethicon, 135 F.3d at 1460.  Here, Plaintiff's evidence falls short.

Plaintiff relies almost exclusively on Mr. Dever's testimony on this issue.  But Mr. Dever's testimony is neither clear nor convincing in showing that Mr. Gerawan made an inventive contribution to the Grape Lug at the parties' first meeting.  Although Mr. Dever testified in conclusory fashion that Mr. Gerawan "provided" Defendant with the ideas for a lid design, ventilation holes, and structured corners, Mr. Dever did not testify (nor can it be readily inferred from his testimony) that Mr. Gerawan provided Rehrig with any of these ideas at the parties' first meeting, as opposed to at one of the other 50 meetings that Mr. Gerawan subsequently had with Mr. Phillips:

> Q:      What was the substance of the conversation [during the first meeting with Rehrig in June or July 1993]?  Can you remember any of the specifics?
>
> A:      [Mr. Phillips] showed me a design, a drawing, of the grape lug, and we chatted about that.  And then – we didn't really have – ourselves, Gerawan Farming, didn't have a lot of interest in the grape box that they were designing, but we had an interest in a harvest tote, and so we chatted about a harvest tote.
>
> Q:      What did you tell Mr. Phillips about the design he showed you for the grape crate?
>
> A:      Specifically?
>
> Q:      Yes.
>
> A:      That we didn't see that there was a need for it at the time, is my recollection.
>
> Q:      Did you tell him anything about the design?
>
> A:      About the – good, bad or indifferent, is that what you're referencing?
>
> Q:      Yes.

A:     I don't recall telling him anything specific about the design of it, whether it was good, bad or indifferent.

* * *

Q:     Do you recall ever providing any designs for a grape crate to Rehrig in the June, July 1993 time frame?

A:     Designs for a grape crate?

Q:     Yes.

A:     Not that I recall.

Q:     Are you aware of anyone else at Gerawan that provided designs for a grape crate to Rehrig in the June or July 1993 time frame?

A:     Not to my knowledge.

Q:     Did you, in the June or July 1993 time frame, provide any specifications for a grape crate to Rehrig?

A:     Not to my knowledge.

Q:     And, to your knowledge, did anyone else at Gerawan Farming in the June or July 1993 time frame provide any specifications for a grape crate to Rehrig?

A:     Again, not to my knowledge.  Sounded like the same question to me, but.

Q:     The first question was related to you personally and then I just wanted to know if you are aware of anyone else at Gerawan who had done that.

A:     Oh, okay.

Q:     So, you know, just to be clear, are you aware of anyone at Gerawan, yourself or any other person working for Gerawan, that provided any specifications to Rehrig for a grape crate in the June or July 1993 time frame?

A:     Not to my knowledge.

(Doc. 81, Ex. C at 31:18-32:13, 37:8-38:12; 46:22-47:6.)

Mr. Gerawan's deposition testimony is also far from enlightening on this issue.  Mr. Gerawan, the supposed co-inventor of the Grape Lug, testified that he could not recall which specific inventive design features he contributed to the Grape Lug, whether at his first meeting with Mr. Phillips in June or at some other time:

Q:     Did you conceive any of the specific design features of this product pictured in Exhibit 9 [the Grape Lug]?

A:     To the best of my knowledge what specifically was I involved in the design of that, I don't recall.  There were discussions on it.  As to what specifics, I don't recall.

14

Q:     And I want the record to be clear, when I said you, I was talking about you personally.

A:     Right.

(Doc. 69-7, Ex. D at 24:3-11.)

Thus, having reviewed the evidence presented as a whole, the Court concludes that Plaintiff has failed to offer clear and convincing evidence demonstrating that Mr. Gerawan made an inventive contribution to the Grape Lug as embodied in the '293 Patent.  Accordingly, Defendant is entitled to summary adjudication of this claim.

**B.     False Promise**

Plaintiff alleges that Defendant made two false promises.  First, Plaintiff alleges that Defendant falsely promised that the parties would jointly own any patent claims related to the Harvest Tote.  (See Doc. 26 ¶¶ 10, 11, 30.)  Second, Plaintiff alleges that Defendant falsely promised that it would not use Plaintiff's confidential proprietary materials for any purpose other than to develop and sell the Harvest Tote for Plaintiff.  (Id. ¶¶ 10, 30.)

A false promise is defined as "[a] promise, made without any intention of performing it."  Cal. Civ. Code § 1710.  In California, a cause of action for false promise may lie where a defendant uses a false promise in order to induce the plaintiff into entering a contract.  Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996).  To prevail, the plaintiff must show that (1) the defendant made a false promise; (2) the defendant knew that the promise was false at the time it was made; (3) the defendant intended to induce the plaintiff's reliance; (4) the plaintiff actually and justifiably relied on the promise; and (5) the plaintiff suffered damages as a result of his reliance.  See Engalla v. Permanente Med. Group, Inc., 15 Cal. 4th 951, 973-74 (1997).

**1.     Joint Ownership of Any Harvest Tote Patents**

Plaintiff's allegation that Defendant falsely promised it that the parties would jointly own any patent claims related to the Harvest Tote plainly lacks merit.  It is undisputed that the Harvest Tote has never been patented, and there is nothing to suggest that the Second Generation Harvest Tote has been patented.  Thus, Defendant could not have breached any promise to own jointly any patent claims on these products since there were never any patents to be shared in the first place.  Plaintiff does not

15

even address this issue, let alone attempt to argue otherwise in its opposition.  Accordingly, Defendant is entitled to summary adjudication of this claim.

### 2.        Use of Proprietary Materials

As for the second alleged false promise, Defendant maintains that there is no evidence showing that it actually knew that this promise was false when it was made.  In other words, Defendant argues that there is no evidence showing that it promised Plaintiff that it would not misappropriate Plaintiff's proprietary materials, while all along intending to break the promise.  See Lazar, 12 Cal. 4th at 638 (to prevail on a claim for false promise, the plaintiff must prove that the defendant never actually intended to keep its promise).  The Court agrees.

Plaintiff argues in its opposition that Defendant intended from the very outset to use Plaintiff's proprietary materials for other, non-sanctioned agricultural products, including the Second Generation Harvest Tote.  However, Plaintiff offers no evidence of this.  The only facts Plaintiff points to on this matter are: (1) Defendant does not usually share patents with its customers; and (2) in February 2002, Defendant noted that its royalty payment to Plaintiff was the largest factor affecting the Harvest Tote price.  While these facts may set a general foundation for showing motive *in 2002*, they alone do not create a genuine issue of fact with respect to Defendant's intentions *in 1993*, the time when the parties reached an agreement on Plaintiff's proprietary materials.  No trier of fact could reasonably infer from these two facts alone that Defendant harbored a secret intention in 1993 to take Plaintiff's proprietary materials to develop its own, unauthorized products, including the Second Generation Harvest Tote.[3] Accordingly, Defendant is entitled to summary adjudication of this claim.

### 3.        Other Promises

The Court notes parenthetically that Plaintiff maintains in its opposition that Defendant made two other false promises: (1) a promise to file patents for the Harvest Tote; and (2) a promise that any improvements to the Harvest Tote would be owned by Plaintiff.  Neither of these promises is alleged

---

[3] The Second Generation Harvest Tote was developed in or around 2001, some *8 years* after the parties agreed to share Plaintiff's proprietary materials.  There is no evidence showing that Defendant conceived of, let alone intended to sell, a Second Generation Harvest Tote at any point near to 1993.

in the operative complaint.  Moreover, the Magistrate Judge very recently denied Plaintiff's motion to amend the pleadings to include these very allegations.  (See Doc. 89.[4])  The Court therefore disregards Plaintiff's arguments on these issues.

### C.      Unfair Competition – Section 17200 and Common Law

Plaintiff alleges that Defendant engaged in unfair competition in violation of the UCL , Cal. Bus. & Prof. Code § 17200, *et seq.*, and California common law in two specific ways: (1) by applying for patent protection over Plaintiff's proprietary design for the Harvest Tote without due attribution to Mr. Gerawan; and (2) by developing and selling the Second Generation Harvest Tote based upon the Harvest Tote design without ever receiving Plaintiff's authorization and without ever paying Plaintiff royalties.  (Doc. 26 ¶¶ 36-37.)

Plaintiff's first allegation lacks merit because, as explained above, Defendant never applied for patent protection for the Harvest Tote.  This, then, leaves Plaintiff's second allegation, specifically that Defendant developed and sold the Second Generation Harvest Tote based on the Harvest Tote design without receiving Plaintiff's authorization or paying Plaintiff any royalties.  On this issue, Defendant argues that: (1) any UCL claim based on this conduct is entirely derivative of Plaintiff's other claims and therefore should "rise or fall" with them; (2) any UCL claim based on this conduct is time-barred; and (3) Plaintiff cannot recover the damages it requests in connection with its UCL claim.  Defendant does not acknowledge the common law component of Plaintiff's claim.

#### 1.      Derivative of Other Claims

It is not particularly clear what Defendant means when it says that Plaintiff's UCL claim is entirely derivative of Plaintiff's other claims.  To the extent that Defendant has construed Plaintiff's UCL claim as resting solely on the "unlawful" prong of the statute, it is mistaken.  The UCL prohibits any unlawful, unfair or fraudulent business practice.  See Cal. Bus. & Prof. Code § 17200.  Because the statute is written in the disjunctive, each prong of the UCL (i.e., unlawful, unfair, or fraudulent) is a "separate and distinct theory of liability." Kearns v. Ford Motor Co., 567 F.3d 1120, 1127 (9th Cir. 2009).  Here, Plaintiff explicitly alleges its UCL claim under the "unfair" prong of the statute, not the

---

[4] Plaintiff has moved for reconsideration of this order.  That motion is still pending.

1    "unlawful" prong.  (Doc. 26 ¶ 37.)

2           It is also conceivable that Defendant's "derivative" argument intended to reassert the argument

3    Defendant raised with respect to Plaintiff's claim for false promise.  Defendant argued there that there

4    is no evidence showing that Defendant used Plaintiff's proprietary materials in developing the Second

5    Generation Harvest Tote.[5]  Defendant maintains that the Harvest Tote and Second Generation Harvest

6    Tote differ significantly because the Second Generation Harvest Tote (1) has an exterior rib structure;

7    (2) has exterior sliders with better stacking ability; (3) does not have hollow corners; (4) is not made

8    with double thick material; (5) has a contoured bottom; (6) has a stacking ledge on all four sides; (7)

9    has an open corner design; and (8) has a plastic handle option.

10          There is a genuine dispute as to which features of the Harvest Tote design were carried over to

11   the Second Generation Harvest Tote and which were not.  Jon Hassel, Defendant's design engineer for

12   the Second Generation Harvest Tote, suggested in his deposition testimony that the Second Generation

13   Harvest Tote (1) has a similar footprint as the Harvest Tote; (2) stacks similar to the Harvest Tote; (3)

14   has the same ventilation percentage as the Harvest Tote; and (4) has similar holes in the bottom of the

15   container for hydrocooling as the Harvest Tote.  Mr. Hassel's deposition testimony creates a genuine,

16   fact-intensive dispute that only a trier of fact can fully resolve.  Accordingly, Defendant is not entitled

17   to summary adjudication on this basis.

18                           **2.      Statute of Limitations**

19          A plaintiff must bring a claim within the relevant limitations period, which begins to run upon

20   accrual of the cause of action.  See Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 806 (2005).  A

21   cause of action generally accrues "'when, under the substantive law, the wrongful act is done, or the

22   wrongful result occurs, and the consequent liability arises."  Norgart v. Upjohn Co., 21 Cal. 4th 383,

23   397 (1999) (internal quotation marks and citation omitted).  In other words, under the general rule, a

24   cause of action accrues when it is complete with all of its generic elements, those being wrongdoing,

25   harm, and causation.  Id.

26

27   _____
           [5] The Court did not address this argument in its analysis of Plaintiff's false promise claim
28   because the Court fully resolved that claim on other grounds.

"An important exception to the general rule of accrual is the 'discovery rule[.]'" Fox, 35 Cal. 4th at 807.  Under the discovery rule, accrual is delayed "until the plaintiff discovers, or has reason to discover, the cause of action." Id. (citations omitted).  "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its [generic] elements,'" that is wrongdoing, harm, and causation. Id. (quoting Norgart, 21 Cal. 4th at 398).  See Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1114 (1988) ("In sum, the limitations period begins when the plaintiff suspects, or should suspect, that she has been wronged.").

Here, it is clear that under the general rule of accrual Plaintiff's unfair competition claim under the UCL would be untimely.  The alleged factual underpinnings of Plaintiff's UCL claim appear to be: (1) the breach of the 1993 Confidentiality Agreement; and (2) the development and selling of the Second Generation Harvest Tote.  Both of these events occurred by 2003, over eight years before Plaintiff initiated this action.  This far exceeds the four-year statute of limitations period for claims under the UCL.  See Cal. Bus. & Prof. Code § 17208; Aryeh v. Canon Business Solutions, Inc., 55 Cal. 4th 1185, 1192 (2013).

The critical question, then, is whether Plaintiff can show that its claim accrued at a later date under the discover rule.  See Investors Equity Life Holding Co. v. Schmidt, 195 Cal. App. 4th 1519, 1533 (Ct. App. 2011) (the burden of proving delayed accrual falls on the plaintiff).  Plaintiff contends that it was only in August 2008, when Mr. Gerawan was told affirmatively that Defendant made and sold the Second Generation Harvest Tote, that Plaintiff suspected its injury.  Plaintiff therefore argues that its claim only began to accrue at that point.  Defendant, meanwhile, maintains that Plaintiff was, or at least should have been, placed on inquiry notice of any injury caused by Defendant's conduct long before 2008.

Viewed in the light most favorable to Plaintiff, the evidence in the record shows the following: (1) Plaintiff knew as of 2002 that Defendant began preparations for designing the Second Generation Harvest Tote; (2) Defendant never represented to Plaintiff that it was actually going to design and sell its own version of the Harvest Tote; (3) in 2003, Plaintiff indicated that one of its affiliates in Mexico was interested in purchasing a next generation harvest tote next year, but believed that Defendant was still in the process of designing the product; and (4) from 2004 to 2006, Mr. Gerawan observed other

harvest totes being used at other farms but did not suspect that Defendant was the producer in light of the 1993 Confidentiality Agreement.  A trier of fact could reasonably conclude from these facts that Plaintiff did not suspect, nor should it have suspected, that Defendant was actually selling the Second Generation Harvest Tote on its own.  In that case, the statute of limitations would not have begun to run until August 2008.

Defendant attempts to tip the scales decisively in its favor by arguing that Plaintiff knew that the Second Generation Harvest Tote was being sold as early as 2003 because Plaintiff purchased close to 2100 of them for a Mexican grower, Castelo Farms.  As support for its argument, Defendant relies on the affidavit of Mr. Kalin and an invoice sent to Mr. Papangellin in April 2003.  The invoice and other notes contain the code "pc002," which according to Defendant is the product code used for the Second Generation Harvest Tote.  However, in his deposition Mr. Papangellin contested this, albeit indirectly.  Mr. Papangellin suggested that he had only purchased original Harvest Totes for Castelo Farms:

> Q:      And so, it's fair to say that you were helping facilitate the sale of harvest totes, or potential sale of harvest totes from Rehrig to Castelo's company?
>
> A:      Which harvest tote are you talking about?
>
> Q:      Any harvest tote.
>
> A:      We had facilitated logistics for harvest totes – first generation harvest totes – the original harvest tote, to be sold and shipped to Nogales for Castelo.

(Doc. 81, Ex. E at 85:6-19.)  Assuming this to be true, this testimony creates a genuine dispute of fact that only a trier of fact can resolve.

In sum, viewing all of the evidence in the light most favorable to Plaintiff, a trier of fact could reasonably conclude that Plaintiff had no reason to suspect prior to August 2008 that Defendant was selling the Second Generation Harvest Tote.  If that is the case, the statute of limitations period began to run only in August 2008, thereby making Plaintiff's action timely.  Accordingly, Defendant is not entitled to  summary adjudication on this basis.

### 3.      Monetary Damages

Plaintiff seeks the following monetary damages in connection with its UCL claim: (1) actual damages; (2) an accounting of Defendant's profits generated from the sales of the Harvest Tote and

the Second Generation Harvest Tote; (3) disgorgement of all unjust profits; and (4) punitive damages. Defendant argues that the UCL does not permit such remedies.

While the scope of the UCL is "broad" and "sweeping," its remedies are "generally limited to injunctive relief and restitution." <u>Cel-Tech Communications</u>, 20 Cal. 4th at 179-80; <u>see</u> <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1144 (2003).  The California Supreme Court has held that restitution in the context of the UCL means (1) money or property that was once in the plaintiff's actual possession; or (2) money or property that the plaintiff has a "vested interest in."  <u>Korea Supply</u>, 29 Cal. 4th at 1149.  "A vested interest is one that is unconditional, absolute, and not contingent.  A contingent interest, on the other hand, is dependent upon an uncertain future event."  <u>Pegasus Satellite Television, Inc. v. DirecTV, Inc.</u>, 318 F. Supp. 2d 968, 979 (C.D. Cal. 2004) (internal quotation marks and citations omitted).

It is difficult for the Court to determine which remedies are available to Plaintiff when neither party has made any attempt to articulate clearly the underlying basis for Plaintiff's UCL claim.  From what the Court can discern, there may be two property interests at issue: (1) the right to use Plaintiff's proprietary materials; and (2) the assignment rights to the Second Generation Harvest Tote.  Facially, these property interests could implicate Defendant's profits from the Second Generation Harvest Tote.  As such, the Court cautiously declines to preclude Plaintiff from recovering such as a remedy under its UCL claim, at least at this time.  Plaintiff is, however, not allowed to recover punitive damages under its UCL claim.  <u>See</u> <u>Korea Supply</u>, 29 Cal. 4th at 1144; <u>Groupion, LLC v. Groupon, Inc.</u>, 859 F. Supp. 2d 1067, 1083 (N.D. Cal. 2012).

## IV.   CONCLUSION

For the reasons set forth above, the Court:

1.   GRANTS Defendant summary adjudication on the following claims and issues:

      a.   Correction of inventorship pursuant 35 U.S.C. § 256;

      b.   False promise under California law; and

      c.   Punitive damages under the UCL.

2.   DENIES Defendant summary adjudication on the following claims and issues:

      a.   Unfair competition under the UCL;

1    b.    Unfair competition under California common law; and

2    c.    Non-punitive monetary remedies under the UCL.

3    3.    ORDERS the parties to file a joint pretrial statement by no later than noon on Tuesday,

4    April 16, 2013.  **The Court emphasizes that it expects the parties' positions on the**

5    **remaining claims to be <u>precise and fully distilled</u> in the joint pretrial statement.**

6    **The Court will not accept a joint pretrial statement wherein the parties set forth a**

7    **laundry list of issues and matters that have not been discussed between/among**

8    **counsel.**

9

10

11   IT IS SO ORDERED.

12   Dated:   **April 8, 2013**                  **/s/ Lawrence J. O'Neill**
13                                           UNITED STATES DISTRICT JUDGE